ASAHEL P. FAIRBANKS'S ADMR. ET AL. *v.* HARRIET A. B. KEISER
ET AL.

May Term, 1912.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed October 3, 1912.

*Equity—Procedure—Failure of Demurrant Seasonably to Bring
on Demurrer for Hearing—Effect as Waiver—Chancellor's
Order to Proceed to Hearing without Prejudice—Effect—
Adequacy of Remedy at Law—Test—How Affected by
Fraud and Undue Influence inducing Transfer of Personal
Property.*

As a rule, a demurrant to a bill in equity must bring on his demurrer
for hearing before trial on the merits, or he will be held to have
waived it; but the chancellor, in his discretion, may protect the
demurrant from that result by ordering that the hearing proceed
without prejudice to the demurrer.

The common law remedies afforded by the actions of trover and re-
plevin are so inadequate as to warrant the interposition of equity,
where a daughter, who now resides with her husband without this
State, by fraud and undue influence induced her father, orator's
intestate, to transfer to her some of his real and personal property,
including a promissory note made by a firm, and to make a will giv-
ing her most of the remainder of his property, and after the father

died a settlement agreement involving the establishment of the will and the validity of those transfers to the daughter was made and fulfilled, whereby the will was to be disregarded and certain real property and all personal property formerly owned by the father was to be treated as a part of his estate, but the daughter still held said promissory note and collected the interest thereon, which facts she fraudulently concealed from the others interested in the estate, and without their knowledge subsequently surrendered the note to the firm for its four new notes aggregating $3,760, payable to her in five, six, seven, and eight years from date, respectively, three of which are not yet due, and later, in order to defraud her father's estate out of the avails of those notes, by indorsement transferred them to her husband, who has since collected the interest thereon, and has presented them for allowance against the estate of one of the deceased partners, and a receiver of the firm has been appointed, who is paying off its debts.

APPEAL IN CHANCERY, Windsor County.   Heard at Chambers, April 1, 1912, *Fish,* Chancellor, on the pleadings, master's report, and demurrer to the bill.   *Pro forma* decree ·dismissing the bill with costs to the defendants.   The orators appealed. The opinion sufficiently states the case.

*Fred C. Davis, William Batchelder* and *Charles Batchelder* for the orators.

*Herbert H. Blanchard* and *Herbert G. Tupper* for the defendants.

POWERS, J.   Asahel P. Fairbanks lived in Springfield, Vt., and died there in 1894.   He was a man of considerable property, which included a promissory note against the firm of Cobb & Derby.   For several years prior to his death he was mentally incapable of transacting business.   In June, 1892, the defendant, Harriet A. B. Keiser, a daughter of Asahel P., then unmarried, took up her abode with him and continued to live there and care for her father until his death.   During this time, she exercised complete dominion and control over him and his property, business and affairs.   She continued to live there for some time after her father's death, married the defendant, Peter Keiser, and

finally moved out of the state, where she and her husband now reside.

Shortly before his death, Asahel P. transferred to Harriet some of his real estate and personal property, which transfer included the Cobb & Derby note. He also made a will, wherein he bequeathed to her most of what remained of his property. These transfers and bequests were procured by the undue influence and fraud of Harriet. The will was offered for probate and allowed, and an appeal taken. The widow of Asahel P. brought proceedings to have her homestead set out. She also brought a bill against Harriet praying discovery of all money, property and estate received from Asahel P. in his lifetime. Some other litigation was pending over the property of the estate. Finally an arrangement of settlement and distribution was effected by the terms of which certain real estate formerly owned by Asahel P., some stock in the Adnabrown hotel, also formerly owned by him, and all other personal property, except certain items not here material, was to be treated as owned by Asahel P. at the time of his death, and the will was to be disregarded. This agreement was in writing, was dated November 12, 1895, and was carried into effect. But Harriet then held the Cobb & Derby note, which fact she fraudulently concealed from the others interested in the estate, and they never knew anything about it or the notes substituted therefor as hereinafter stated, until September 1, 1909. On or about April 1, 1904, Harriet asked Cobb & Derby to give her new notes in place of the one she held. This they did. They gave her four notes dated April 1, 1904, aggregating $3,760, falling due in five, six seven and eight years, respectively. Sometime after this Harriet indorsed and transferred these notes to her husband, Peter. This was done to enable Harriet and Peter to defraud the estate out of the avails thereof.

William H. Cobb of the firm of Cobb & Derby died in February, 1909, and an administrator and commissioners were duly appointed on his estate. Peter presented the four notes for allowance against Cobb's estate, and the matter is still pending. At some time a receiver was appointed of the firm of Cobb & Derby, and he is paying off the debts of that firm. Harriet had collected the interest on the debt as long as she held it, and Peter has collected the interest since the notes were transferred to him. Neither has accounted to the estate for any part of this.

These are the facts set up in the bill. The prayer is for an injunction restraining Harriet and Peter from collecting the four notes, and restraining the administrator of Cobb and the receiver of the firm from paying them, for discovery of Peter and Harriet of the sums they have received on account of this indebtedness, for an accounting from them of such sums, for a decree directing Peter to transfer said four notes to the administrator of Asahel P., and for general relief.

The defendants Peter and Harriet answered the bill, a replication was filed, a special master was appointed, and a hearing before him was begun on November 12, 1910. Two days before this, the defendants, Peter and Harriet, filed an application for leave to amend their answers. It does not appear from the record that anything was done with this application until April 6, 1911, when leave was granted by the chancellor to file amended answers containing demurrers for want of equity, and such demurrers ordered to lie until the coming in of the master's report. The amended answers were filed on the same day. The hearing before the master went on until it was completed, and a report was duly filed. On April 1, 1912, a *pro forma* decree dismissing the bill was entered. The orators appeal. The defendants only brief the demurrers.

The general rule in chancery is that one who demurs must bring his demurrer on for hearing before the merits are gone into, or he will be held to have waived it. *Enright* v. *Amsden,* 70 Vt. 183, 40 Atl. 37. But this is a rule of procedure, merely, and the chancellor may, in the exercise of a wise discretion, protect a demurrant from such a result by making an order to the effect that the hearing shall go on without prejudice to the demurrer. That is just what this chancellor did, and therein he was only returning to the practice of a former day when a demurrer contained in an answer was not brought on for hearing until the case was heard on the merits; then it was heard, and on appeal the whole case came up, demurrer and all. *Westminster* v. *Willard,* 65 Vt. 266, 26 Atl. 952. So the demurrer is here and must be considered.

The only ground of demurrer specified or argued is that the orators have an adequate remedy at law.

The defendants insist that the rule is that in ordinary controversies concerning the ownership or possession of chattels, equity has no jurisdiction, though fraud is involved, since the

common law actions of trover and replevin usually afford an adequate remedy. But this is not an ordinary controversy. Its unusual features are many and obvious. It involves fraud, positive, deliberate and sustained. The original note has been converted into new ones running to one of the defendants, and these have been once transferred by indorsement. When the bill was brought, three of these notes were not yet due. Proceedings for their collection are pending. The receiver is settling the affairs of the firm which gave them. The principals in the fraud, the present holder of the notes and his wife, are nonresidents. Payments of interest have been made to two different persons. Payment of the notes or another transfer of them would or might seriously embarrass the estate in the protection of its rights. In these circumstances it cannot be said that the remedy at law is "as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity," —which is the test. *Bourke* v. *Olcott Water Co.,* 84 Vt. 121, 78 Atl. 715, 33 L. R. A. (N. S.) 1015.

But we do not think it is necessary to give controlling prominence to these special features in order to uphold the jurisdiction of equity in the case before us.

In *Wood* v. *Rowcliff,* 2 Phill. 382, it was held that equity had jurisdiction to require the delivery of personal property, the possession of which was acquired through abuse of power on the part of one standing in a fiduciary relation to the plaintiff.

And to the same effect is *Steinmeyer* v. *Siebert,* 190 Pa. St. 471, 42 Atl. 880, 70 Am. St. Rep. 641, wherein it is said: "Where the wrong is a betrayal of confidence, equity will decree restitution, which may be enforced specifically against the wrongdoer."

*Webb* v. *Fuller,* (Me.) 1 Atl. 737, much resembles the case in hand. There, the intestate had for some years entrusted to her sons the complete possession and control of her property; they managed it as they pleased, and finally converted it to their own use; the intestate was weak and infirm, and the sons fraudulently obtained her signature to releases, assignments and pretended settlements; the suit was by her administrator, who sought discovery and relief. The bill was demurred to, but the court said that "equity should not hesitate to give a helping hand," in the circumstances presented.

In *Benson* v. *Keller,* 37 Or. 120, 60 Pac. 918, the orator, who had sundry valuable due-bills was induced by the fraudulent

representations of the defendant to deliver them to him for the purpose of paying the orator's debt; but the defendant hypothecated the due-bills for his own debt. The suit was to compel restitution. It was held that equity had jurisdiction, though the defendant was solvent and could be proceeded against at law.

Our own case of *Heath* v. *Capital Savings Bank & Trust Co.,* 79 Vt. 301, 64 Atl. 1127, is much to the point. There, the defendant bank held certain notes signed by the oratrix, which were secured by collateral belonging to her. She had no benefit from these notes, but she was mentally incompetent, and was induced to sign them and pledge the collateral by the undue influence of another who was the real debtor,—all of which was known to the bank when it took the notes and collateral. The bill being demurred to, it was held that the remedy at law was not adequate, and that the bill made a case for equitable relief.

*The pro forma decree is reversed and the cause is remanded with directions to enter a decree for the orators.*